JOHN B. MASSARO *vs.* THE SAVOY ESTATES REALTY COMPANY.

Third Judicial District, Bridgeport, October Term, 1929.

WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

Argued November 1st, 1929—decided January 6th, 1930.

*Arthur M. Comley,* for the appellant (defendant).

*William W. Bent,* for the appellee (plaintiff).

HAINES, J.   Prior to November 10th, 1916, a corporation known as Robbins, Ltd., of Toronto, Canada, was in the real estate business in different parts of Canada and the United States, and a majority of its stock was owned by one Frederick B. Robbins.  This corporation caused another corporation—the defendant in this action—to be formed at Bridgeport, with two hundred and ninety shares of stock of which Robbins owned two hundred and forty-four.  This latter corporation purchased a tract of land in Bridgeport for the purpose of resale, and this sale was committed to another corporation which was formed under the name of Robbins-Connecticut, Incorporated.   One William H. Drews owned one share of the defendant corporation and was its secretary.  The Robbins-Connecticut, Incorporated, ceased to sell the lands of the defendant corporation after a time, and Drews, under an agreement with the defendant corporation, undertook the sale upon commission.  Drews made a written contract with the plaintiff, Massaro, which appears in the record as Exhibit A.  In this agreement Drews appears as party of the first part and Massaro as party of the second part, and it was mutually agreed that Massaro was to enter the service of Drews as salesman for this land, which was known as The Savoy Estates, the contract stating that the sale of this land "is controlled by the party of the first part," and Massaro was to act "subject to the general control of the party of the first part."   The contract then provides, among other things, that Drews agrees to sell and Massaro to buy any of the unsold Savoy Estate lots at $125 each, and when sold by him, to make a contract with the puchaser at his own figures and upon his own terms, but the price per lot to be not less than $250. Massaro was to pay Drews ten per cent of the selling price, down, and the balance of the money to be col-

lected by Drews from the purchaser of the lot; that Drews was to retain one half of all the moneys collected up to the full sale price of the lot, and in addition to deduct from the monthly collections, five per cent for his services in making the collections. It was further provided that if Massaro sold a lot for less then $250, then Drews was to retain all the moneys collected until the price of $125 per lot had been fully paid. All sales made by Massaro were to be subject to the approval of Drews. The contract then provided: "In the event of any of the purchasers failing to carry out their agreement with the party of the second part and the said sale is cancelled, the right and title in and to said land shall revert back to the party of the first part." Certain rules, regulations and restrictions were formulated and it was agreed that Massaro should conform thereto and also incorporate them into each of his sale contracts with purchasers. During the life of the contract, Massaro was given the exclusive sale of all the unsold lots.

The trial court has found that Drews agreed to the sale price of $125 per lot as fixed in this contract, only upon the consent and approval of the owner—the defendant corporation. Massaro sold a substantial number of these lots and upon the sale of each lot, Massaro entered into a written contract with the defendant corporation, which appears in this record as Exhibit B, for the purchase by himself of that lot, and when the ultimate purchaser became entitled to a deed, he was furnished one executed and delivered direct to him by the corporation.

Drews operated a corporation in Bridgeport called The Drews-Fuller Company, and conducted his own personal real estate business, and the business of his corporation, as well as the business of the defendant corporation in Bridgeport. Each purchaser of a lot

was furnished an instalment payment book in which the instalment payments were entered by Drews or by someone authorized by him. The name of the defendant corporation did not appear on these books. When receipts were given for these instalment payments, they were issued in the name of The Drews-Fuller Company. After a time Drews moved to New Jersey, and employed one McNamara to make these collections for him. McNamara made some collections and forwarded them to Drews in New Jersey, but the latter died and McNamara then made three remittances to Robbins, Ltd., in Toronto.

The contract Exhibit B which Massaro made with the defendant corporation whenever he sold a lot, recited that the defendant had agreed to sell and the plaintiff had agreed to buy that lot; that the plaintiff agreed to pay the defendant $125 per lot with ten per cent down upon execution of the agreement, and the balance in monthly payments as therein specified with interest; that upon the execution of the agreement, the defendant would give possession to the plaintiff who could then occupy and use the lot, subject to the rules, regulations and restrictions above referred to, to be inserted in the deed to the purchaser of the lot, and some further restrictions imposed upon the plaintiff himself. Upon full payment in accordance with this agreement, the defendant was to convey the lot to the purchaser by warranty deed, free and clear of all incumbrances save the restrictions referred to. The 8th paragraph provided: "Until further notice from the seller to the buyer, all payments shall be made to the seller."

The complaint in this action alleges that Drews was the secretary and agent of the defendant corporation, and was acting in that capacity when he made the contract Exhibit A with the plaintiff, and, particularly,

that in providing that all collections from purchasers of lots should be made to Drews, he was acting as secretary and agent of the defendant corporation. The complaint further alleges that as such agent and representative of the defendant corporation, Drews did collect various sums of money and has never accounted to the plaintiff therefor. This, as the trial court correctly held, presents the controlling question in the case, viz: whether Drews was acting for himself in a personal capacity or as agent and representative of the defendant. The trial court concluded that he was acting as authorized agent and representative, and ordered that the defendant should account to the plaintiff.

The defendant-appellant sought certain changes in the finding, but none were pressed upon this appeal save that relating to this controlling question. All the other assignments of error raise, in one form or another, this and allied questions.

The entire evidence is reproduced in the record, and counsel for the appellee inserts a long statement of the facts which he claims were established, and makes extensive and specific references to portions of the evidence in support of his contentions. This is an altogether unwarranted use of the evidence; this court must look to the finding and that alone for the established facts.

The first four assignments of error relate to four conclusions of the trial court: (1) that Drews was the agent of the defendant corporation in selling the lots, (2) that Drews was the agent of the defendant corporation in collecting the payments from purchasers, (3) that the plaintiff was the agent of the defendant corporation in making sales of lots, and (4) that after the lots sold by the plaintiff had been conveyed to purchasers by the defendant corporation, Drews and The Drews-Fuller Company were agents of the de-

fendant corporation in making the collections. Counsel for the appellee again mistakenly bases his argument in support of these conclusions upon long citations from the evidence. The conclusions cannot be thus supported. If they are sustained they must be sustained by facts which appear in the finding and in the contracts which are a part of the finding. These we have already summarized with sufficient detail.

From this it appears that the defendant owner of the property, instead of carrying out the purpose of the purchase of this property by itself selling the lots, delegated that portion of the enterprise solely to another as its general agent. That general agent was at first The Robbins-Connecticut, Incorporated, and that agent was in turn succeeded by Drews, the secretary and a stockholder of the defendant owner, who then became the general agent for the owner and was to be paid a commission for his services. As such general agent he was clothed with an authority co-extensive in scope with the business entrusted to him, that is, to do all that was usual and customary in such cases. *Dresser & Co., Inc.* v. *Insurance Companies,* 101 Conn. 626, 641, 126 Atl. 912; *Simpson & Harper* v. *Harris & Scrandrett,* 174 Ala. 430, 56 So. 968; *Swanson* v. *Andrus,* 84 Minn. 168, 176 N. W. 363; *Duncan* v. *Hartman,* 143 Pa. St. 595, 22 Atl. 1099; *German Fire Ins. Co.* v. *Grunert,* 112 Ill. 68, 1 N. E. 113.

The defendant having made the secretary, Drews, its general agent and sole representative in Bridgeport for the handling of this property and left its management entirely in his hands, the plaintiff, in dealing with Drews, was justified in assuming that Drews was doing what the owner could have done in making terms with the plaintiff for the sale of the lots. *State* v. *Marley,* 78 Conn. 330, 333, 62 Atl. 85; *Byxbee* v. *Blake,* 74 Conn. 607, 613, 51 Atl. 535; *Kearns* v. *Nickse,* 80

Conn. 23, 25, 66 Atl. 779; *Van Santvoord* v. *Smith*, 79 Minn. 316, 82 N. W. 642; *Russo* v. *McAviney*, 96 Conn. 21, 27, 112 Atl. 657; *Citizens Trust & Surety Co.* v. *Zane*, 113 Fed. 596; *Mahoney* v. *Hartford Investment Corporation*, 82 Conn. 280, 286, 73 Atl. 766; *Falletti* v. *Carrano*, 92 Conn. 636, 638, 103 Atl. 753. The contention of the appellant, however, seems to be that this contract with the plaintiff could not bind the defendant owner of the property, because it was made in the name of Drews himself.

"There is a broad line of distinction between instruments under seal and stipulations in writing not under seal, or by parol. . . . In the latter cases the question is always one of intent; and the court, being untrammelled by any other consideration, is bound to give it effect. As the meaning of the lawmaker is the law, so the meaning of the contracting parties is the agreement. Words are merely the symbols they employ to manifest their purpose that it may be carried into execution. If the contract be unsealed and the meaning clear, it matters not how it is phrased, or how it is signed, whether by the agent for the principal or with the name of the principal by the agent or otherwise. The intent developed is alone material, and when that is ascertained it is conclusive." *Whitney* v. *Wyman*, 101 U. S. 392, 395; *Adams* v. *Whittlesey*, 3 Conn. 560; *Ogdon* v. *Raymond*, 22 Conn. 379, 385.

In this contract it appears, specifically, that the land was owned, not by Drews, but by the defendant, who is named, and that the sale of the lots was entirely controlled by Drews, who was thus clearly indicated as the general agent of the owner.

It further appears from the finding that, before Drews made the contract, he consulted with the owner as to the price per lot to be inserted in the contract. That Drews was acting for the defendant is further

shown by a provision in the contract made with the plaintiff, that if a lot purchaser failed to carry out his contract and the sale were cancelled "the right and title" to the lot should revert back to the "party of the first part." It is apparent that by the "party of the first part" Drews was here referring to the defendant owner of the property and not to himself individually. The agreement also refers to and makes binding certain regulations and restrictions contained in the sale contract, to which resort must thus be had. That was a contract made direct with the defendant as owner of the property, by the plaintiff, who is described therein as the "purchaser," the defendant being called the "seller." This contract prescribes in great detail exactly how these lots shall be handled, and provides that the ultimate purchaser of the lot shall receive a deed direct from the owner, and that all payments shall be made to the "seller," i. e., the defendant herein. This contract is signed by Drews as "secretary and agent, duly authorized," of the defendant. Not only was the plaintiff thus put in direct contractual relations with the defendant owner, but this second contract recognizes and virtually adopts the first contract which was made in Drews' own name. These two contracts being connected by reference and subject-matter, both are to be considered in determining the real intent of the parties. *Washington Mutual Fire Ins. Co.* v. *St. Mary's Seminary,* 52 Mo. 480, 489. The intent of all the parties to procure the sale of these lots belonging to the defendant, through the efforts of the plaintiff, is abundantly clear. Whatever form or words was adopted to bring this about, the courts are bound to make that intent the controlling consideration of its decision. *Whitney* v. *Wyman,* 101 U. S. 392, 395. That Drews was the general agent of the defendant owner clothed with authority to appoint a

subagent for the sale of these lots, and that, by the procurement of Drews, the plaintiff became the subagent of the defendant in the sale of these lots, is clearly apparent.

The purpose of the various provisions in the two contracts which prescribe how the money to be collected from purchasers of lots should be handled, was obviously made for the benefit of the principal and to ensure protection against the handling of the cash by the subagent at any point. That these collections extended to the full price of the lot paid by the ultimate purchaser, instead of being limited to the price which the plaintiff was to ensure to the defendant owner, does not in any way change the legal effect of this provision, and it must be considered as incidental only to the general purpose of the principal to keep the cash in its own hands. It is not unlikely that this provision also served some purpose which does not appear on the face of the transaction. The relation of principal and subagent existing between the plaintiff and the defendant owner, cannot be held to be in any way changed by a detail of this character. Moreover, it is disclosed by the finding that these moneys were not only paid in fact to an authorized representative of the defendant, viz: Drews or his corporation, but in three instances at least, were paid direct to the parent company, Robbins, Ltd., of Toronto. On the clearest principles of equity, the defendant should account to the plaintiff.

There is no error.

In this opinion the other judges concurred.